UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
TRANSPORT WORKERS UNION OF AMERICA,
AFL-CIO,

        Plaintiff,

    -against-                            04 Civ. 5210 (LAK)

TRANSPORT WORKERS UNION OF GREATER
NEW YORK, LOCAL 100,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

    Appearances:

        Peter D. DeChiara
        COHEN, WEISS AND SIMON LLP
        *Attorney for Plaintiff*

        Arthur Z. Schwartz
        KENNEDY, SCHWARTZ & CURE, P.C.
        *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge*.

        Plaintiff Transport Workers Union of America, AFL-CIO ("TWU") brought this action against one of its locals in substance to compel the local to abide by the determinations of plaintiff's Appeals Committee with respect to a contested election. The local ("Local 100") counterclaimed for damages based on the theory that TWU caused Local 100 to hold re-runs of elections. Only the counterclaim remains undecided. The parties stipulated that the Court would

try on the existing record the issue of whether TWU is liable for the cost of holding the elections.[1]

*Facts*

TWU is a national union of employees in the transportation industry. Local 100 represents employees in New York. It was "chartered by and [is] affiliated with TWU"[2] and it is bound by its own bylaws as well as the TWU Constitution.

Local 100 holds elections for its officers every three years.[3] In 2003, Local 100 president Roger Toussaint ran for re-election on a slate that called itself the "Toussaint Unity Team" and that already controlled 34 of the 46 seats on the executive board.

In anticipation of the election, the Local 100's executive board promulgated election rules pursuant to Article XI(b) of its bylaws.[4] They provided in relevant part:

> "No employer shall be permitted to contribute anything to any campaign. The prohibition on employer contributions extends to every employer regardless of the nature of the business, or whether any union represents its employees, and includes but is not limited to political action organizations (other than a candidate's or slate's campaign organization), nonprofit organizations such as churches or civic groups, law firms, and professional organizations. These prohibitions include a ban on the

---

[1] Stipulation of July 6, 2005.

[2] Rule 56.1 St. ¶ 2.

[3] Local 100 is composed of fifteen divisions, each of which belongs to one of seven departments. At each election, members of a given division may vote for Local 100's president, financial secretary-treasurer and recording secretary, as well as the division's seats within Local 100's executive board, the division's officers, and the relevant department's vice-president. Local 100's executive board is composed of 46 members.

[4] *See* Pl. Ex. 5.

contribution and use of stationery, equipment, facilities and personnel."[5]
Furthermore, "[t]he prohibition on campaign contributions extends to all labor organizations . . . except as permitted"[6] in ways that are not material to this dispute. The rules provided also that a neutral monitor appointed by Local 100 would resolve protests related to the election.[7] The TWU Appeals Committee was given exclusive power to hear appeals from the determinations of the neutral monitor.[8] Local 100 appointed Barbara Deinhardt to serve as the neutral monitor for this election.

*The Burke Letter*

In the months leading up to the election, the Toussaint Unity Team distributed a flyer criticizing Myra Burke, the president of Queens Bus Corporation,[9] an employer of Local 100 members. Burke responded to the allegations made by Toussaint's slate in a letter dated November 19, 2003 and printed on company stationery (the "Burke letter").[10] Toussaint's slate filed a protest with Deinhardt on November 20, arguing that the letter constituted a campaign contribution in

---

[5] Pl. Ex. 7, Art. IV § 5(A)(2).

[6] *Id*. § 5(A)(3).

[7] *Id.*, Art. III, "The Neutral Monitor."

[8] *Id.*; *see also id.*, Art. IV § 6.

[9] *See* Pl. Ex. 10.

[10] Pl. Ex. 11.

derogation of the rules. Deinhardt agreed with Toussaint and ordered a re-election on December 31, 2003.[11] That decision was appealed. On January 22, 2004, the TWU Appeals Committee prohibited the new elections on the ground that Burke merely had "respon[ded] to the charges made against her by a 'Toussaint Unity Team' leaflet" and that this did not violate the election rules.[12]

*The Hall Letter*

On November 11, 2003, Local 100 executive board members received a letter from TWU president Sonny Hall criticizing Toussaint.[13] The two-page letter was printed on TWU stationery and served as a cover letter for a flyer "produced by a private firm, paid for by" Hall, that "addresses the 'lies' that [TWU], and in particular, myself refused request [*sic*] from President Toussaint to assist Local 100 in their contract fight with the M.T.A."[14] The attached flyer allegedly provided "[p]roof of the Roger Toussaint 'big lie.'"[15]

On November 17, 2003, the Toussaint slate filed a protest with Deinhardt alleging that Hall's mailing constituted an improper campaign contribution because it had been made using TWU funds. Deinhardt found that the mailing violated the election rules, but she deferred the issue

---

[11] Pl. Ex. 13.

[12] Pl. Ex. 14 at 2.

[13] Toussaint and TWU president Sonny Hall had a strained relationship prior to the election. The defendants have submitted ample evidence of such strains in Toussaint Cert. of July 23, 2004, Ex. Z, a tome of documents that is largely irrelevant to the dispute.

[14] Def. Ex. E.

[15] *Id*.

5

of a remedy. Local 100 member Paul Rosenberg appealed Deinhardt's decision two days later.[16] On January 5, 2004, after the election was held but before the Appeals Committee ruled on the complaints regarding the Burke and Hall letters, Deinhardt decided that Hall's mailing required re-running the elections for several executive board seats[17] and for the division chair of the Car Equipment Division. She observed also that ties in the votes would mandate new elections for other positions. On January 6, 2004, while Local 100 was preparing to hold new elections, a competing slate attempted to obtain a stay of the elections;[18] as the elections took place, the request must have been denied.

On January 9, 2004, Local 100's executive board ordered the elections to be re-run ("January 2004 Elections"). It hired the American Arbitration Association ("AAA") to administer the elections. The AAA sent out three ballots, one of which was wholly unrelated to the Hall mailing controversy.

On January 28, 2004, the Appeals Committee reversed Deinhardt's decision with

---

[16] Defendant repeatedly contends that this appeal was not timely because it was received on December 1, 2003, more than three business days after Deinhardt's decision and therefore in violation of the rules. *See* Pl. Ex. 7, Art. III, "The Neutral Monitor;" Art. IV § 6(I)(1). This is not material to the dispute. Furthermore, November 28 was Thanksgiving, and the office seemingly was closed on the day after Thanksgiving. Lastly, defendant has conceded the point that the appeal was made two days later by not filing a Rule 56.1 Statement opposing plaintiff's Rule 56.1 Statement at ¶ 25.

[17] She found that elections for the executive board seats allocated to the Car Equipment and the TA Surface Operations divisions may have been affected. *See* Pl. Ex. 18.

[18] *See* Def. Ex. I.

respect to the Hall letter because the protest had been untimely[19] and in any event the mailing had not affected the election outcome. It ordered also that the January 2004 ballots not be counted.

*Department of Labor Involvement*

Dissatisfied with the determinations of the Appeals Committee, the Toussaint Unity Team contacted the United States Department of Labor ("DOL"). On May 19, 2004, the DOL wrote a letter summarizing its findings.[20] It concluded that the Hall mailing violated Section 401(g) of the Labor Management Reporting and Disclosure Act ("LMRDA").[21] Accordingly, the DOL noted that a new election should be run for the two executive board positions allocated to the TA Surface Operations not won by the Toussaint slate. It stated also that the Burke letter had violated the LMRDA and may have affected three elections. It encouraged the union to abide by the DOL's determination by holding new elections for all these positions voluntarily rather than face legal action by the Secretary of Labor.

After Hall informed Local 100 that the TWU would not challenge the DOL's findings, Local 100 opted to abide by the DOL's suggestions rather than to litigate. But the local went beyond the DOL's recommendations. On May 20, 2004, its executive board decided to hold new elections for other positions and to count the votes from the January 2004 election for the division chair of the Car Equipment Division.

---

[19] The rules imposed a 48 hour limit on protests, while the complaint had been filed with Deinhardt six days after Hall's letter had been received. *See* Pl. Ex. 21.

[20] Def. Ex. G.

[21] 29 U.S.C. § 481(g).

*TWU's Investigation*

On January 5, 2004, Toussaint and Local 100 financial secretary-treasurer Ed Watt wrote a letter contending, among other things, that Hall's mailing constituted a breach of the fiduciary duty he owed the union. The letter requested that TWU's International Executive Council ("IEC"), one of the TWU's governing bodies, sue Hall under Section 501 of the LMRDA.[22] The investigatory subcommittee appointed by the IEC concluded that Hall had breached the LMRDA when he wrote and mailed his letter, but that the amount at issue, $344.69, was too small to merit instituting a costly civil action.[23] The IEC adopted the subcommittee's conclusions.[24]

*This Action*

TWU brought this action to enjoin Local 100 from proceeding with its election plans. This Court ruled on August 3, 2004 that Local 100 was bound to comply with the TWU Appeals Committee decisions except insofar as this was inconsistent with the determinations of the DOL. In September 2004, Local 100 held new elections for the positions suggested by the DOL ("September 2004 Elections").

Local 100 initially had counterclaimed to recover for certain election costs. The issues of liability and damages on the counterclaim were severed during the August 2004 proceedings. Local 100 now seeks reimbursement for certain costs associated with (1) running the

---

[22] 29 U.S.C. § 501.

[23] Pl. Ex. 15. The IEC observed also that Hall had reimbursed the TWU.

[24] Rule 56.1 St. ¶ 54.

January 2004 Elections, (2) running the September 2004 Elections, and (3) employing Deinhardt. TWU moved for summary judgment dismissing this counterclaim. On July 6, 2005, the parties stipulated that the Court would try the counterclaim on the summary judgment record.

*Discussion*

Local 100 apparently seeks to recover its costs on three different theories. It first contends that (1) TWU breached the TWU Constitution through its agent Hall or, alternatively, by the acts of the TWU Appeals Committee, (2) the TWU Constitution is a contract, and therefore (3) TWU owes monetary damages for breach of contract. Local 100 argues also that its theory is "tort-like"[25] and that TWU violated the LMRDA.[26] Ultimately, Local 100 has failed to meet its burden.[27]

The legal theories presented by Local 100 at best are questionable. Although the parties agree that the TWU's constitution is a contract among the national union and its locals,[28] Local 100 has failed to point to a single relevant section within the TWU Constitution. Nor has

---

[25] Def. Br. at 15. Local 100 asserts in its pleadings that its theory of liability "is also tort-like" and that "Sonny Hall's breach of his fiduciary responsibility, his violation of the LMRDA, and the Appeals Committee's decision to ignore the LMRDA, all had tort-like impact on Local 100." *Id*.

[26] *See, e.g., id*.

[27] The burden arguably is greater when the case centers around a dispute between a national and its local union. As the Supreme Court explained, congressional statutes covering union elections were enacted bearing in mind the "long-standing policy against unnecessary governmental intrusion into internal union affairs." *Wirtz v. Glass Bottle Blowers Ass'n*, 389 U.S. 463, 471 (1968). TWU and its locals are distinct entities, but the issue of who bears the costs of an election appears internal.

[28] *See e.g., United Ass'n of Journeymen & Apprentices v. Local 334*, 452 U.S. 615, 619-27 (1981); *Shea v. McCarthy*, 953 F.2d 29, 31-32 (2d Cir. 1992).

Local 100 explained how the actions of Hall or of the Appeals Committee constituted a breach of contract. Second, Local 100 fails to identify any tort committed by the TWU. Lastly, although Local 100 seemingly raises a claim under the LMRDA, it fails to explain how any of the acts of Hall or the Appeals Committee could ground a claim for damages under the LMRDA. But it ultimately is not necessary for the Court to determine whether Local 100's contentions are legally sound. Local 100's counterclaim fails in any event because Local 100 has failed to prove that any act by TWU proximately caused Local 100's injuries.

TWU did not cause Local 100 to spend money on Deinhardt. Local 100 appointed Deinhardt and made her available to hear all protests. It chose to spend its money in a particular way, as it concedes in its memorandum.[29] The actions of Hall and the Appeals Committee were not a proximate cause of Local 100's expenditure for Deinhardt's time.

Second, the TWU Appeals Committee did not cause Local 100 to hold the re-run elections. Local 100, remarkably, argues that the Committee caused Local 100 to hold re-runs in January 2004 in part because it did not stay the re-elections when so requested.[30] This contention is baseless. Local 100 chose to hold those elections, knowing that Deinhardt's decisions were on appeal. It took the risk that the Appeals Committee would reverse Deinhardt, an eminently foreseeable event. The Appeals Committee's inaction therefore did not cause the January 2004 Elections

In light of the foregoing, the TWU cannot be liable for any re-election caused by the

---

[29] Def. Br. at 3 ("The Local 100 Executive Board also chose to utilize the services of a Neutral Monitor to resolve election disputes.").

[30] Def. Br. at 10.

Burke letter because none of TWU's actions proximately caused these re-elections. Burke is not affiliated with TWU, and TWU cannot be liable for her actions.

Nor did TWU cause the new elections related to Hall's mailing. Even they were held at Local 100's behest. The determinations of the DOL were not binding. Both the DOL and TWU left it up to Local 100 to decide what it wanted to do: hold new elections or face a civil action by the DOL. The outcome of such a suit would have been far from certain, especially as it relates to Hall's mailing. Local 100 must bear the costs of running the re-election it chose to run.[31]

*Conclusion*

Defendant's counterclaim is dismissed. Upon entry of judgment, the Clerk shall close the case.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated: July 20, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[31] Rule 56.1 St. ¶ 38.